**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LANE OFFICE FURNITURE, INC.,

      Plaintiff,

v.

DIRTT ENVIRONMENTAL SOLUTIONS, INC.,

      Defendant.

---

**VERIFIED COMPLAINT AND JURY DEMAND**

---

      Lane Office Furniture, Inc. ("Lane Office" or "Plaintiff"), by and through its undersigned counsel, files this Verified Complaint and Jury Demand against Defendant, DIRTT Environmental Solutions, Inc. ("DIRTT" or "Defendant"), and for its claims and causes of action states as follows:

**INTRODUCTION**

      1.    Lane Office is a nationally-known, New York-based supplier of office furniture and office construction supplies, and has been in business since 1922. Lane Office employs forty-four (44) individuals and has successfully completed office construction contracts involving in excess of 100,000,000 square feet nationwide.

      2.    DIRTT, a Colorado corporation with a principal place of business in Alberta, Canada, is a designer and supplier of office construction products, including wall/partition

components, millwork, extrusions, raised floors and ceiling tiles, and has been in business since 2005.

3.      For the past fifteen (15) years, Lane Office and DIRTT have had a long-standing and mutually beneficial business relationship.  This relationship has been a very profitable and successful one for DIRTT.

4.      When DIRTT was formed in 2005, it invited Lane Office's President, Gregory F. Burke, to join its Board of Directors and asked Lane Office and Burke to assist DIRTT in growing its product lines throughout the United States, which they did.

5.      From 2005 through 2018, Lane Office grew its annual sales of DIRTT products from $3 million to $35 million and promoted DIRTT's products regularly to others within the industry.

6.      While at first a simple handshake agreement, the Lane Office/DIRTT relationship has been memorialized by a succession of contracts, and is currently controlled by the DIRTT Regional Partner Agreement, dated March 9, 2018 (the "Agreement"), attached hereto as Exhibit A.  The Agreement terminates on its own, if not extended by agreement of the parties, on December 31, 2020.

7.      Unfortunately, in September 2018, approximately 6 months after the Agreement was executed, DIRTT underwent a management change.  Almost immediately, new management began taking actions in breach of the Agreement, in an attempt to undermine the parties' relationship, as is more fully detailed in the body of the Complaint below.

8.      Despite this, Lane Office continued to act in good faith compliance with the terms of the Agreement, and continued procuring clients and project contracts beneficial to both Lane Office and DIRTT.

9.      After its 2018 management change, DIRTT, on multiple occasions, began to directly contact and negotiate contracts with Lane Office national accounts in breach of the Agreement and DIRTT's duty of good faith and fair dealing thereunder.  On each occasion of which Lane Office is aware, Lane Office insisted that the Agreement be honored.

10.     Upon information and belief, DIRTT's intentions since its management change are – and has been - to wrongfully cut Lane Office out of the distribution chain, take Lane Office's national accounts for itself, and to profit from its blatant breach of the parties' Agreement.

11.     Frustrated (due to the obligations owed per the Agreement) in their attempts to wrongfully usurp Lane Office's national accounts directly, DIRTT has now egregiously chosen to use the unprecedented COVID-19 viral pandemic to do indirectly what they clearly are prohibited from doing directly under the terms of the parties' Agreement.  The Agreement does not permit DIRTT to prematurely cancel the contract without cause, and none of the specific bases of cause articulated in the Agreement - and required to effect a termination of Lane Office - are present here.

12.     In March 2020, the catastrophic COVID-19 pandemic struck in the United States, and shortly thereafter New York (Lane Office's home and principal place of business) became the epicenter of outbreak for the disease.

13.     Lane Office's business operations have been substantially and materially impacted due to the COVID-19 pandemic and the government "stay at home" orders issued in response thereto.

14.     From March through May 2020, a number of legislative actions, at the local, state and federal levels, directly impacted the ability of businesses throughout New York State to operate, and ultimately forced the closure of most businesses deemed "non-essential."

15.     On March 7, 2020, New York Governor Andrew Cuomo declared a state of emergency for the State of New York.

16.     Only days later, on March 12, 2020, Governor Cuomo imposed restrictions upon mass gatherings, and ordered businesses to reduce their capacities to 50%.

17.     On March 16, 2020, President Donald Trump issued federal guidance aimed at preventing the spread of COVID-19, which included encouraging employees to work at home, avoiding gatherings of ten or more people, and in states with evidence of "community transmission," the closure of bars, restaurants, food courts, gyms and other indoor and outdoor venues where groups of people congregate.

18.     Effective March 17, 2020, New York City Mayor Bill de Blasio issued an executive order closing all New York City schools, bars and restaurants, as well as certain other entertainment-related venues.

19.     Simultaneously, on March 20, 2020, President Trump issued a Major Disaster Declaration for the State of New York.

20.     Finally, effective March 22, 2020, Governor Cuomo issued an executive order (known as "NYS on PAUSE") ordering the full closure of all business facilities deemed non-

4

essential until at least May 15, 2020.  Governor Cuomo has indicated that he intends to extend aspects of the NYS on Pause order past May 15, 2020.

21.     As a result of the emergency declarations issued by Governor Cuomo and President Trump, the cumulative restrictions and prohibitions resulting from these declarations that forced the partial or full closure of businesses and risk of exposure of employees to COVID-19 and other potential impairment to persons and property, businesses throughout the State were forced to close.

22.     It is in the midst of this worldwide health and financial crisis, one that hits Lane Office particularly hard as it exists at the epicenter of the outbreak, that DIRTT has now chosen to wrongfully declare a termination of the Agreement in a blatant attempt to avoid its contractual obligations, usurp Lane Office's nationwide accounts for themselves, and undermine and discredit Lane Office in the industry by leaving them unable to fulfill existing and future contract orders made in reliance upon the Agreement, without any legal basis to do so.

23.     Lane Office has millions of dollars in pending orders for DIRTT products for in-progress jobs that have been temporarily halted due to the COVID-19 crisis.  In addition, at the time DIRTT attempted to wrongfully terminate the Agreement, Lane Office had outstanding bids to customers which, if accepted, would result in additional millions of dollars in orders for DIRTT products.

24.     Premature and wrongful termination of the contract will cost Lane Office millions of dollars in lost revenue due to orders that cannot be fulfilled.  Further, premature termination of the Agreement will irreparably damage Lane Office's business reputation in the industry, as Lane Office risks failure to fulfill existing obligations to major clients such as New York

University Medical Center a/k/a NYU Langone, Sloane Kettering, Jefferies Financial Group, Emblem Health and Hofstra University.

25.     Accordingly, it is essential that the Agreement be honored and remain in effect through its agreed expiration date of December 31, 2020.

26.     Lane Office asks this Court to require DIRTT to honor its contractual obligations pursuant to the terms of the Agreement through December 31, 2020.  Lane Office is of the opinion that the Agreement remains in full force and effect, and that breaches of contract damages, while an alternative, would not be sufficient to fully compensate Lane Office for the harm that would be caused by DIRTT's failure to honor the terms of its contractual obligations.

27.     Lane Office has also suffered, and continues to suffer millions of dollars in damages as a result of DIRTT's willful and wanton breaches of the Agreement.

28.     Finally, as a result of DIRTT's repeated breaches of the Agreement, it is "first in breach" of the contract, and therefore is foreclosed from exercising any rights to terminate the Agreement, even if facts existed to support such termination, which they do not.

### THE PARTIES, JURISDICTION, VENUE
### AND GOVERNING LAW

29.     This litigation arises from DIRTT's wrongful and unjustified breach of contract, DIRTT's direct interference with Lane Office's existing and prospective business relationships and its improper attempts to terminate the Agreement.  Plaintiff seeks alternative relief based on various contract, tort and equitable claims.

30.     Lane Office is a New York corporation with its principal place of business in New York, New York.

31.     DIRTT is a Colorado corporation registered with the Colorado Secretary of State

that transacts business throughout the United States.  DIRTT has a principal office address in Calgary, Alberta, Canada.

32.     Subject matter jurisdiction, personal jurisdiction, and venue are proper in the United States District Court for the District of Colorado pursuant to the express provisions of the Agreement.  The Agreement expressly provides that: "Any disputes or claims arising out or relating to this Agreement or any other document, instrument or agreement executed in connection herewith shall be subject to the exclusive jurisdiction of the provincial or federal courts for the State of Colorado to which the parties irrevocably submit."  Agreement at 13.

33.     The Agreement also provides that "any issues, disputes or claims arising out of or in connection with [the Agreement] shall be governed by, and construed in accordance with, the laws of the state of Colorado."  Agreement at 13.

34.     This Court has subject matter jurisdiction over all claims asserted herein under 28 U.S.C. § 1332(a) because the dispute is between entities of different States and exceeds $75,000 exclusive of interest and costs.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), as the Defendant is subject to personal jurisdiction pursuant to incorporation in the State of Colorado and pursuant to contract.

## GENERAL ALLEGATIONS

### The Fifteen Year Relationship Between Lane Office And DIRTT

36.     DIRTT is a designer and supplier of construction products, including wall/partition components, millwork, extrusions, raised floors and ceiling tiles.

37. From DIRTT's formation in 2005 through 2019, Lane Office was the exclusive distributor of DIRTT products for the New York Metropolitan area, including New York City, Long Island and Westchester.

38. During this time, Lane Office was also a distributor of DIRTT products to Lane Office's national clients, including clients located outside the New York Metropolitan area.

39. In addition, from 2005 through mid-2018, Gregory F. Burke, Lane Office's Chief Executive Officer and majority owner, served as a member of DIRTT's Board of Directors.

40. While the relationship between Lane Office and DIRTT was originally based upon an oral agreement, effective October 1, 2011 through September 30, 2012, the parties entered into a written agreement prepared by DIRTT entitled the "DIRTT Distribution Partner Agreement."

41. Upon the expiration of the DIRTT Distribution Partner Agreement, the parties entered into a series of successive agreements that were materially identical to the DIRTT Distribution Partner Agreement.

42. Effective January 1, 2018, DIRTT and Lane Office entered into the DIRTT Regional Partnership Agreement (the "Agreement"), which underlies this litigation. The Agreement is attached hereto as Exhibit A and incorporated herein by this reference.

43. The Agreement has a three year term, and expires on December 31, 2020.

44. Pursuant to the Agreement, Lane Office, as a DIRTT Regional Partner, was provided with access to DIRTT products, access to DIRTT's proprietary "ICE Technology" system for pricing and processing projects (for which Lane Office pays a significant software fee), sales and marketing support, customer service, as well as a host of additional DIRTT

resources aimed at assisting Lane Office with its sales of jobs involving DIRTT Projects.

45.     In February of this year Lane Office paid DIRTT a $43,784.09 fee to ensure Lane Office's continuing access to DIRTT's ICE Technology software for pricing and ordering DIRTT products through February 2021.

46.     From 2005 through 2018, the relationship between Lane Office and DIRTT flourished.  The volume of DIRTT products sold by Lane Office steadily increased, resulting in significant profits for both companies.

### DIRTT's 2018 Change In Management;
### New Management's Wrongful Conduct in Breach of the Agreement

47.     On September 20, 2018, DIRTT's interim-President and Chief Executive Officer, Michael Goldstein, left for employment with another entity, and Kevin O'Meara ("O'Meara") was named as his replacement.

48.     Unfortunately, almost immediately after O'Meara's appointment as President and Chief Executive Officer of DIRTT, the relationship between Lane Office and DIRTT began to deteriorate.

49.     Since at least 2005, based upon the long-standing relationship between Lane Office and DIRTT, Lane Office – with DIRTT's knowledge and consent – operated under the "trade name" of DIRTT NY.

50.     Almost immediately after O'Meara's appointment as President and Chief Executive Officer of DIRTT, on October 19, 2018, DIRTT wrote to Lane Office and instructed Lane Office that it was no longer permitted to use the name DIRTT NY or any other derivation of that name that included "DIRTT" going forward.

51.     In addition, DIRTT's new management directly interfered with Lane Office's

relationship with Lane Office's national accounts and attempted to divert those accounts to other DIRTT regional partners in violation of the Agreement.

52.     With respect to Lane Office national accounts, under the heading "National Accounts / Inter-Marker / Servicing", the Agreement provides:  "National accounts belong to the Regional Partner with the relationship regardless of where the install is occurring.   If the Regional Partner with the relationship chooses to partner with another Regional Partner for install or support, it will be a business transaction determined by the two Regional Partners involved.   DIRTT will not be involved in inter-market area agreements between the Regional Partners."  Agreement at 7.

53.     On June 25, 2018, Lane Office was awarded a significant project relating to JPMorgan Chase's 1,000,000+ square foot project in New York City, known as "HQ2," as well as future JPMorgan Chase projects.

54.     On that date, JPMorgan Chase and DIRTT entered into a "Master Procurement Agreement."   Lane Office was primarily responsible for DIRTT being named a party to the Master Agreement, and by letter agreement between Lane Office and DIRTT dated August 1, 2018 (effective as of June 25, 2018, the effective date of the Master Procurement Agreement), Lane Office was designated as the "Preferred Supplier" for all JPMorgan Chase projects under the Master Procurement Agreement (the "Letter Agreement").

55.     Pursuant to the Master Procurement Agreement and the Letter Agreement, Lane Office was granted a right of first refusal as Preferred Supplier of DIRTT products for all future JPMorgan Chase projects.

56.     Over the ensuing months, DIRTT, through O'Meara and other senior executives,

repeatedly acknowledged that the JPMorgan Chase HQ2 project and future projects resulted from the relationship built by Lane Office (through Burke) and that JPMorgan Chase was a national account of Lane Office.

57.     Nonetheless, beginning in June of 2019, DIRTT – through O'Meara – embarked on a course of conduct aimed at excluding Lane Office from the relationship with JPMorgan Chase and stealing this significant national account from Lane Office.

58.     To that end, during the months of June and July 2019, O'Meara scheduled a number of meetings with JPMorgan Chase executives without including, or even informing, Lane Office.

59.     In January 2020, Lane Office became aware through a contact at JPMorgan Chase that DIRTT had obtained a JPMorgan Chase project in Columbus, Ohio.  In violation of the Agreement, the Master Procurement Agreement and the Letter Agreement, DIRTT had submitted a bid for this project through a local Ohio distributor, and that the project – and all revenue associated therewith – would belong to the Ohio distributor, and not Lane Office.

60.     Despite being reminded of the terms of the Agreement, the Master Procurement Agreement and the Letter Agreement, which establish Lane Office as the Preferred Supplier for all JPMorgan Chase jobs and provide Lane Office with a right of first refusal for such jobs, DIRTT refused to relent in its position, and even instructed Lane Office not to pursue the project with JPMorgan Chase.

61.     DIRTT's improper interference with existing Lane Office national accounts did not end there.

62.     For several years, one of Lane Office's largest national accounts has been New

York University School of Medicine and the NYU Langone Health group of companies (together, "NYU"). For the period 2016 through 2019 alone, Lane Office procured at least ten separate NYU jobs for which it used DIRTT products.

63.     DIRTT was aware that NYU was a national account of Lane Office.

64.     In March 2019, Lane Office learned that DIRTT had met directly with NYU about current and future jobs. Despite the fact that NYU was a national account of Lane Office, DIRTT did not inform Lane Office of this meeting or invite Lane Office to participate.

65.     After Lane Office confronted DIRTT's O'Meara concerning this meeting, O'Meara informed Lane Office that it intended to allow another one of its regional partners to service the NYU account.

66.     DIRTT's decision to allow another one of its partners to service the NYU relationship was a breach of the Agreement. In or around February 2020, in further breach of the Agreement, DIRTT allowed another one of its distribution partners to submit a DIRTT proposal on an NYU project.

67.     Likewise, Jefferies Financial Group ("Jefferies") is a long-time national client of Lane Office. Prior to November 2018, Lane Office had submitted orders to DIRTT for projects in excess of $750,000.

68.     In June 2019, Lane Office's Burke was contacted by his contact at Jefferies, who was concerned that Jefferies had received a bid on a Houston, Texas project from Agile Interiors, another DIRTT distributor. Jefferies had specifically instructed its Houston team to proceed only with Lane Office as the DIRTT distributor.

69.     On June 21, 2019, Jefferies' Houston team provided Lane Office with

"AutoCAD" drawings for the Houston project so that Lane Office could submit a bid for that project, which bid Lane Office submitted to Jefferies on June 24, 2019.

70.     On June 26, 2019, Lane Office spoke to DIRTT's Vice-President of Sales, Kingsley Koch, who authorized Lane Office to offer Jefferies an additional 5% discount on DIRTT products, but asked if Lane Office would be partnering with DIRTT's other distributor, Agile Interiors, on the project.  Lane Office responded that because Jefferies was a long-standing national account, it would not be partnering with DIRTT's other distributor on this project.

71.     The next day, on June 27, 2019, in connection with Lane Office requesting further DIRTT discounting so as to make Lane Office's bid more competitive relative to a competing bid using comparable (non-DIRTT) products, DIRTT's Koch informed Burke that the Jefferies Houston project would be pursued by Agile Interiors and that Lane Office was not authorized to pursue the project.  Lane Office rejected this determination and reminded DIRTT / Koch that Jefferies was a long-standing national account of Lane Office for whom Lane Office had submitted nearly $1 million orders for DIRTT products over the years.

72.     In early July, 2019, Jefferies and Lane Office negotiated master terms and conditions to be applicable for all projects with Jefferies, including the Houston project.  Despite DIRTT's improper and unlawful interference, with Jefferies' support, the job was ultimately awarded to Lane Office.

73.     In addition to the foregoing, despite the fact that DIRTT had featured Lane Office on DIRTT's webpage for years, on or about April 3, 2020, DIRTT ceased including Lane Office on its company webpage.

74.     Under the Agreement, DIRTT is required to provide Lane Office with access to

DIRTT's proprietary pricing and ordering software, called "ICE Technology."

75.     In fact, as recently as February 2020, DIRTT charged Lane Office a fee of $43,784.09 for access to this software through February 2021, after the expiration of the Agreement.

76.     Since mid-April, DIRTT restricted Lane Office's access to ICE Technology, in direct violation of the Agreement, and despite the fact that Lane Office had already paid for such access through February 2021 and outside vendors (not regional partners) are provided access to this technology free of charge.

77.     On April 14, 2020, DIRTT sent Lane Office a letter purporting to terminate the Agreement based upon alleged contrived, historical defaults by Lane Office, none of which defaults had ever previously been noticed by DIRTT to Lane Office.

78.     While the Agreement provides DIRTT with the right to terminate based upon "a [d]efault in the Regional Partner's performance of any obligations under this Agreement," Lane Office did not default in performing any of its obligations under the Agreement.

79.     Moreover, DIRTT attempted to terminate the Agreement in the midst of a pandemic where DIRTT knew – pursuant to an express "force majeure" clause in the Agreement – that even if Lane Office had defaulted (they did not), DIRTT was precluded from declaring an immediate  termination on such default since "(e)ach party will be excused for any failure or delay in its performance under this Agreement due to causes that are beyond its reasonable control, including but not limited to an act of God, act of civil or military authority…epidemic…and government action…").  Agreement at 13.

80.     DIRTT's attempt to terminate the Agreement was not lawful but was in fact

merely pretextual and without basis in law or fact.

81.     DIRTT's baseless and pretextual declaration of default is, in itself, a breach of the Agreement.

82.     DIRTT's failure to honor its obligations under the Agreement constitutes a default under that Agreement.

83.     As such, DIRTT's purported termination of the Agreement was improper.

84.     At the time of DIRTT's purported termination of the Agreement, Lane Office had and has a number of pending jobs that called for the use of DIRTT products, which would, once completed, result in orders to be filled by DIRTT for $1,334,937.66

85.     In addition, at the time of DIRTT's purported termination of the Agreement, Lane Office has a number of outstanding bids to customers for new jobs, which bids are based upon the use of DIRTT products.  If accepted, those bids would result in additional orders of DIRTT products of over $3,265,040.85.

86.     While DIRTT refused to rescind its wrongful termination declaration, DIRTT has agreed to extend the time for Lane Office to submit jobs for which Lane Office previously submitted bids to customers using DIRTT products until August 12, 2020.

87.     DIRTT has informed Lane Office that it will not fill orders received after August 12, 2020, even for bids that were made by Lane Office prior to DIRTT's purported termination.

88.     If DIRTT refuses to fill orders received after August 12, 2020, Lane Office's reputation and relationships with existing and prospective customers, as well as industry contacts that are the source of a significant amount of Lane Office's business, will be irreparably harmed.

89.     Finally, since early 2020, DIRTT has directly contacted existing Lane Office

customers and relationships, both disparaging Lane Office and misrepresenting that Lane Office was no longer an authorized distributor of DIRTT products.

90.     For example, since late 2019, Lane Office has been working with Memorial Sloan Kettering Cancer Center ("MSK") on a significant project.  Lane Office's bid to MSK included DIRTT products.  In mid-April 2020, contemporaneous with DIRTT's purported termination of the Agreement, DIRTT indicated that (in direct violation of the Agreement) it would not complete work on any orders that had not been received at the time of termination, including the MSK project.  In fact, despite Lane Office's months of work on this bid and project, DIRTT attempted to introduce another of its regional partners to take over the deal, hence cutting Lane Office out, but MSK specifically informed DIRTT that it would only work on this project with Lane Office.

91.     Likewise, since October 2019, Lane Office has been working extensively on a bid for a significant project for the Federal Reserve Bank of New York (the "NYFR").  Lane Office expended significant time and effort on this bid, in addition to approximately $10,000 to create a "mock up" requested by the NYFR.  Lane Office ultimately submitted a bid for this project in early March 2020.

92.     After having not received a response to its request for the status of its bid, on May 13, 2020, Lane Office was informed by the general contractor for the project that they have been in regular contact with DIRTT, and expected that DIRTT was keeping Lane Office updated as to the status of its bid.  DIRTT's interference with Lane Office's relationship on this project is improper and is an obvious attempt to cut Lane Office out of this significant project.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

93.     Lane Office incorporates by reference paragraphs 1 through 92 as if fully set forth herein.

94.     This is a claim for declaratory relief pursuant to Fed. R. Civ. P. 57, and 28 U.S.C. § 2201 and/or C.R.C.P. 57, and C.R.S. § 13-51-101, et. seq.

95.     Lane Office seeks a declaration of rights and obligations under the Agreement, and specifically a declaration that the Agreement remains in full force and effect and that all parties to that Agreement are required to honor its terms through the end of 2020.

96.     Specifically, Lane Office asks this Court to consider the "Cancellation" provisions of the Agreement, *see* Agreement at 11-12, and to construe the same in light of DIRTT's purported termination, within the context of the Agreement as a whole.

97.     A judgment or decree by the Court, if rendered or entered on this issue, would end the uncertainty, insecurity, and controversy with respect to the rights, status, or other legal relations between the parties.

98.     Resolution of this matter in a rapid manner is essential to the preservation of the status quo.  Further delay on this issue will cause greater prejudice and injury to Lane Office. Accordingly, Lane Office requests that the Court order a speedy hearing of the action for a declaratory judgment pursuant to the rule.

99.     For these and other reasons, Lane Office asks the court to declare that DIRTT's purported termination of the Agreement was improper, is null and void, and that the Agreement remains in full force and effect through December 31, 2020.

### SECOND CLAIM FOR RELIEF
#### (Breach of Contract)

100.   Lane Office incorporates by reference paragraphs 1 through 99 as if fully set forth herein.

101.   The Agreement is a binding, enforceable, written contract between Lane Office and DIRTT.

102.   Lane Office complied with all of its obligations under the Agreement.

103.   DIRTT breached its obligations under the Agreement by, inter alia, (i) interfering with the relationship between Lane Office and its national account, JPMorgan Chase, and awarding a JPMorgan Chase project to another DIRTT distribution partner; (ii) interfering with the relationship between Lane Office and its national account, NYU; (iii) removing Lane Office from DIRTT's webpage; (iv) restricting Lane Office's access to DIRTT's ICE Technology software; (v) purporting to terminate the Agreement in violation of the Agreement's terms; and (vi) upon said purported termination, indicating that in further violation of the Agreement, it would not fill orders received after May 14, 2020 for jobs for which Lane Office issued proposals utilizing DIRTT products prior to DIRTT's purported termination of the Agreement.

104.   The Master Procurement Agreement and Letter Agreement are binding, enforceable, written contracts between Lane Office and DIRTT.

105.   Lane Office complied with all of its obligations under the Master Procurement Agreement and Letter Agreement.

106.   DIRTT breached its obligations under the Master Procurement Agreement and Letter Agreement by awarding a JPMorgan Chase project to another DIRTT distribution partner.

107.   As a result of DIRTT's breaches of the Agreement, the Master Procurement Agreement and the Letter Agreement, Lane Office has consequentially suffered damages, and is

entitled to contract damages for loss of past and future profits and interest in amounts to be proven at trial.

### THIRD CLAIM FOR RELIEF
#### (Breaches of Implied Covenant of Good Faith and Fair Dealing)

108.   Lane Office incorporates by reference paragraphs 1 through 107 as if fully set forth herein.

109.   DIRTT expressly promised Lane Office to honor the Agreement and owed as an implied covenant, an obligation of good faith and fair dealing.

110.   The Agreement provides that Colorado law governs.   *See* Agreement at 13. Under settled Colorado law, all contracts are subject to a mandatory term requiring good faith and fair dealing.

111.   DIRTT had a duty to perform the terms of the contract in good faith, and DIRTT had a concomitant duty to refrain from doing things that would deprive Lane Office of the reasonable and mutually anticipated benefits of the Agreement.

112.   DIRTT's course of conduct towards Lane Office from October 2018 through present constitutes bad faith and is in breach of the implied covenant of good faith and fair dealing.

113.   DIRTT's conduct deprived Lane Office of the reasonable expectation of benefiting from the Agreement, as described herein above.

114.   DIRTT's breach of the implied covenant of good faith and fair dealing caused Lane Office losses and consequential damages in amounts to be proven at trial.

### FOURTH CLAIM FOR RELIEF
#### (Willful and Wanton Breach of Contract)

115.   Lane Office incorporates by reference paragraph 1 through 114 as if fully set forth herein.

116.   DIRTTs breaches of contract referenced above were committed by DIRTT knowingly, or where DIRTT must have realized that the conduct was dangerous, and such breaches were done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights of Lane Office.

117.   DIRTTs breaches of the Agreement and wrongful attempt to declare a termination thereof were done willfully and wantonly, and with a blatant disregard of Lane Office's rights.

118.   DIRRT's willful and wanton breaches of the Agreement caused Lane Office losses and consequential damages in amounts to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Intentional Interference with Existing Contractual Obligations)

119.   Lane Office incorporates by reference paragraphs 1 through 118 as if fully set forth herein.

120.   Lane Office had ongoing relationships with NYU, JPMorgan Chase, MSK, the NYFR and a number of other customers, of which DIRTT was aware.

121.   With knowledge of Lane Office's relationships with NYU, JPMorgan Chase, MSK, the NYFR and other customers, and through words and/or conduct, DIRTT intentionally induced those Lane Office customers not to do business with Lane Office.

122.   DIRTT, through words and other conduct has intentionally interfered with existing ongoing contractual relationships the Lane Office has with NYU, JPMorgan Chase, MSK, the NYFR and other customers.

123.   DIRTT's words or conduct were improper.

124.   DIRTT's interference with Lane Office's existing business relationships has caused substantial harm to Lane Office.   Lane Office has suffered substantial pecuniary loss, including the pecuniary loss of the benefits of the contract and other consequential losses (*e.g.*, attorneys' fees, etc.) for which the interference is a legal cause, and actual harm to reputation.

## SIXTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Contractual Relations)

125.   Lane Office incorporates by reference paragraphs 1 through 124 as if fully set forth herein.

126.   Lane Office had prospective business relationships with NYU, JPMorgan Chase, MSK, the NYFR and a number of other customers, of which DIRTT was aware.

127.   With knowledge of Lane Office's relationships with NYU, JPMorgan Chase, MSK, the NYFR and other customers, and through words and/or conduct, DIRTT intentionally interfered with customers, inducing them not to do business with Lane Office.

128.   DIRTT, through words and other conduct has intentionally interfered with the future prospective business and contractual relationships the Lane Office has with NYU, JPMorgan Chase, MSK, the NYFR and other customers.

129.   DIRTT's words or conduct were improper.

130.   DIRTT's interference with Lane Office's future prospective business relationships has caused substantial harm to Lane Office.   Lane Office has suffered substantial pecuniary loss, including the pecuniary loss of the benefits of the contract and further prospective relations and business opportunities, other consequential losses (*e.g.*, attorneys' fees, etc.) for which the interference is a legal cause, and actual harm to reputation.

## SEVENTH CLAIM FOR RELIEF

**(Outrageous Conduct)**

131.    Lane Office incorporates by reference paragraphs 1 through 130 as if fully set forth herein.

132.    DIRTT engaged in extreme and outrageous conduct as described hereinabove.

133.    DIRTT did so recklessly or with the intent of causing Lane Office and its principal, Gregory F. Burke, severe emotional distress.

134.    DIRTT's conduct caused Lane Office and Burke severe emotional distress damages in amounts to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Mandatory Preliminary and Permanent Injunctive Relief**
**Pursuant to Fed. R. Civ. P. 65)**

135.    Lane Office incorporates by reference paragraphs 1 through 134 as if fully set forth herein.

136.    Lane Office is entitled to the benefit of its bargain, and as such this Court should require DIRTT to fulfill the terms of the Agreement through the end of December, 2020.

137.    Pursuant to Fed. R. Civ. P. 65 and the common law, Lane Office is entitled to mandatory preliminary and permanent injunctive relief because: (i) Lane Office has a reasonable probability of success on the merits; (ii) there is a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (iii) there is no other plain, speedy, and adequate remedy at law; (iv) the granting of a preliminary injunction will not disserve the public interest; (v) the balance of equities favors the injunction; and (vi) the injunction will preserve the status quo pending a trial on the merits.

138.    If the Court allows DIRTT to refuse to fill orders from Lane Office received by DIRTT after August 12, 2020, Lane Office will suffer irreparable harm.

139.    Over several decades, Lane Office has built up close relationships with customers, including national accounts such as JPMorgan Chase and NYU, as well as numerous regional, national and international general contractors.

140.    DIRTT's refusal to honor the Agreement will cause Lane Office to default on proposals made to those customers and general contractors and will irreparably damage Lane Office's reputation.

141.    The damage to Lane Office's reputation and good will would not only be impossible to quantify but would take years (if even possible) to repair.

142.    Thus, to avoid irreparable injury, Lane Office requests that the Court issue a preliminary and permanent injunction requiring DIRTT to continue to fill orders received until December 31, 2020 (*i.e.*, the expiration date of the Agreement).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Lane Office respectfully prays for judgment against Defendant DIRTT upon each and all of the claims for relief asserted herein above, for all remedies available to Lane Office in law and equity, including, without limitation:

1.    on the First Claim for relief, a declaration of Lane Office's rights against DIRTT under the Agreement, in accordance with the proofs at trial and pursuant to applicable law, including a declaration that DIRTT's wrongful attempt to declare a termination of the Agreement is null and void, and therefore, the Agreement is and shall remain in full force and effect both at the present time and through the natural end of that contract, December 31, 2020;

2.　　on the Second through Seventh Claims for relief, a constructive trust on all profits and monies DIRTT has realized as a result of their wrongful conduct, as well as a money judgment for all economic loss and to make Lane Office whole from and against all breaches of duties owed by DIRTT to Lane Office in an amount to be proven at trial;

3.　　on the Eighth Claim for relief, an injunction requiring DIRTT to continue to fill orders received from Lane Office utilizing DIRTT products through December 31, 2020;

4.　　an award of reasonable attorneys' fees, costs, and expenses incurred in this action, including but not limited to pursuant to the Attorneys' Fees provision of the Agreement, *see* Agreement at 13;

5.　　prejudgment, post-judgment, and/or moratory interest in accordance with law; and,

6.　　such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of any and all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: May 22, 2020.

Respectfully Submitted,

**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**


*/s/ David K. TeSelle*

Michael S. Burg
David P. Hersh
David K. TeSelle
Kirsten N. Kube
40 Inverness Drive East
Englewood, CO 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
E-Mail: mburg@burgsimpson.com
E-Mail: dhersh@burgsimpson.com
E-Mail: dteselle@burgsimpson.com
E-Mail: kkube@burgsimpson.com

*Attorneys for Plaintiff*


Plaintiff's Address:

Lane Office
256 W 38th Street
New York, NY 10018

## VERIFICATION OF COMPLAINT

STATE OF NEW YORK      )
                                 )
COUNTY OF NASSAU      )

I, GREGORY F. BURKE, as Chief Executive Officer and majority owner of Lane Office Furniture, Inc., having been duly sworn under oath, state that I have read the above and foregoing Verified Complaint and Jury Demand, and affirm that the allegations contained therein are true, in substance and in fact, to the best of my personal information, knowledge, and belief.

_____

GREGORY F. BURKE
Chief Executive Officer
Lane Office Furniture, Inc.

SUBSCRIBED and SWORN before me this _____ day of _____, 2020, by Gregory F. Burke, Chief Executive Office of Lane Office Furniture, Inc.

      Witness my hand and official seal.

My Commission Expires: _____

_____

NOTARY PUBLIC

CERTIFICATION IN CONNECTION WITH DOCUMENT NOTARIZED BY AUDIO-VISUAL MEANS PURSUANT TO NEW YORK STATE EXECUTIVE ORDER 202.7

Linda Klemballa, a Notary Public duly sworn and commissioned in the State of New York, under Registration No. 01KL6130742, hereby certifies as follows:

1. On May 22,  2020, I observed via audio-visual technology Gregory Burke executed the following documents:

    a.   Verification of Complaint

    b.

2. I was presented with the following two forms of valid photo identification during the audio-video conference:

    a.   Driver's license

    b.   New York Athletic Club membership card

3. The video conference allowed for direct interaction and was not a pre-recorded video of the documents being signed.

4. I was presently situated in the State of New York, Suffolk County while the audio-video conference was taking place.

I make this Certification under the penalties of perjury and upon personal knowledge that the statements in this Certification are true and that this Certification is executed in order to induce First American Title to issue its policy of title insurance based upon the statements made herein.

_Linda Klemballa_
_____